IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

**BRIAN DUANE COLVIN,**                          Case No. 5:18 CV 1249

      Plaintiff,                          Judge John R. Adams

      v.                          Magistrate Judge James R. Knepp II

**COMMISSIONER OF SOCIAL SECURITY,**

      Defendant.                          **REPORT AND RECOMMENDATION**

## INTRODUCTION

Plaintiff Brian Duane Colvin ("Plaintiff") filed a Complaint against the Commissioner of Social Security ("Commissioner") seeking judicial review of the Commissioner's decision to deny disability insurance benefits ("DIB") and supplemental security income ("SSI"). (Doc. 1). The district court has jurisdiction under 42 U.S.C. §§ 1383(c) and 405(g). This matter has been referred to the undersigned for preparation of a report and recommendation pursuant to Local Rule 72.2. (Non-document entry dated June 1, 2018). Following review, and for the reasons stated below, the undersigned recommends the decision of the Commissioner be affirmed.

## PROCEDURAL BACKGROUND

Plaintiff filed for DIB and SSI in October 2011, alleging a disability onset date of July 28, 2010. (Tr. 236-39). His claims were denied initially and upon reconsideration. (Tr. 184-90, 197-208). Plaintiff then requested a hearing before an administrative law judge ("ALJ"). (Tr. 78). Plaintiff (represented by counsel), and a vocational expert ("VE") testified at a hearing before the ALJ on July 9, 2013. (Tr. 34-77). On July 29, 2013, the ALJ found Plaintiff not disabled in a written decision. (Tr. 14-27). The Appeals Council denied Plaintiff's request for review, making the hearing decision the final decision of the Commissioner. (Tr. 1-3); *see* 20 C.F.R. §§ 404.955,

404.981, 416.1455, 416.1481. On December 14, 2013, Plaintiff filed a complaint against the Commissioner of Social Security. *See Colvin v. Comm'r of Soc. Sec.*, 5:13-cv-2674 (N.D. Ohio) (Doc. 1). In a written decision dated March 31, 2015, this Court remanded the matter for further consideration of Listing 1.04. (Tr. 810-14); *Colvin v. Comm'r of Soc. Sec.*, 2015 WL 1471769 (N.D. Ohio).

On remand, Plaintiff (again represented by counsel), and a vocational expert ("VE") testified at hearings before the ALJ on November 1, 2016 (Tr. 699-734), and April 11, 2017 (Tr. 648-64). On April 28, 2017, the ALJ again found Plaintiff not disabled in a written decision. (Tr. 622-36). The Appeals Council denied Plaintiff's request for review, making the hearing decision the final decision of the Commissioner. (Tr. 612-18); *see* 20 C.F.R. §§ 404.955, 404.981, 416.1455, 416.1481. Plaintiff timely filed the instant action on June 1, 2018. (Doc. 1).

## FACTUAL BACKGROUND

Personal Background and Testimony

Born in April 1966, Plaintiff was 44 years old on his alleged onset date. *See* Tr. 740. He has a high school education, *id.*, and prior relevant work in a foundry, grinding and hammering steel (Tr. 758).

*2013 Hearing*

At the time of the July 2013 hearing, Plaintiff had lived in his vehicle for a year. (Tr. 741). He had no income and no longer resided with his mother because his step-father would not allow it. *Id.*

Plaintiff testified he started taking Vicodin "yesterday", and it was "the first time [he'd] been prescribed anything for [his] pain." (Tr. 743). Prior to Vicodin, he took Tylenol and aspirin for pain management. *Id.* Plaintiff testified to continued pain in his neck, which often caused

migraines, and radiated down both arms. *Id*. He had pain in his back which traveled down his legs (Tr. 744), and the pain was "constant". (Tr. 744-45). Plaintiff thought he could walk for 30 feet, sit for "a little bit" (Tr. 748-49), and lift up to fifteen pounds for a "very short" period of time (Tr. 757-58).

Plaintiff was able to maintain personal care, and occasionally helped his mother wash dishes after dinner when they ate together. (Tr. 761). He drove to Delaware to visit his daughter approximately twice in 2011. (Tr. 755). He felt pain in his back and fatigue during the trip, but was able to cope by using cruise control and frequent stops. (Tr. 756).

*2016 Hearing*

At the time of the November 2016 hearing, Plaintiff lived with his mother in Akron after recently moving back from Virginia. (Tr. 707).

Plaintiff stated he had "constant" lower back pain. (Tr. 709). He had recently begun aqua therapy, which helped take the weight off his lower back and other joints. (Tr. 707, 709).

Plaintiff had no pain relief from ibuprofen, gabapentin, or a TENS unit. (Tr. 710). He could not be on his feet for more than fifteen minutes without experiencing lower back pain. (Tr. 711). Plaintiff also had pain with "abrupt movements", bending over, and lifting heavy objects. *Id*. He could sit, but "ha[d]to move around a little bit." *Id*. Plaintiff generally had trouble lifting but stated he could lift a gallon of milk from the refrigerator. (Tr. 715).

Plaintiff acknowledged a gap in treatment a few years following a 2008 ulnar nerve operation, but stated it was due to a lack of insurance coverage. *See* Tr. 716-17, 722. Plaintiff experienced some relief from the ulnar nerve surgery, but testified his condition – specifically his back pain, neck pain, arm weakness, and fatigue – worsened in the years since. (Tr. 721).

3

Finally, Plaintiff testified he cooked his own meals, and showered and dressed himself, though he sometimes had difficulty with socks and shoes. (Tr. 720).

*2017 Hearing*

At the time of the supplemental hearing in April 2017, Plaintiff lived in Virginia with his daughter. (Tr. 653, 658). His physical condition was "about the same". (Tr. 657). Plaintiff was not on any new medications and was not undergoing therapy in Virginia. (Tr. 657-58). Around the house, Plaintiff helped with dishes "a little bit", and tried to help with other chores as much as he could. (Tr. 659).

Relevant Medical Evidence[1]

In July 2010, Plaintiff sought treatment at Wadsworth-Rittman Hospital after falling down the stairs. (Tr. 365). He complained of right-sided neck pain and generalized back pain. *Id*. On examination, Plaintiff had good range of motion, was ambulatory, and had a normal gait. *Id*. A CT scan of Plaintiff's spine revealed mild degenerative disc disease at C4-5 and no fracture or subluxation of the cervical spine. (Tr. 368). At a follow-up visit later that month, Plaintiff's examination was generally unremarkable. (Tr. 356).

Plaintiff went to the hospital to obtain medical clearance for substance abuse treatment in August 2010; he had no physical complaints except rib pain and an examination revealed a supple, non-tender neck with full range of motion. (Tr. 351). Plaintiff's nerves were grossly intact, he had full upper and lower extremity muscle strength, and his gait was within normal limits. (Tr. 352).

In November 2010, Mark Pluskota, D.O., examined Plaintiff due to complaints of moderate

---

1. Although Plaintiff suffers from both physical and mental impairments, and cites treatment records of both in his brief, the arguments raised before this Court *only* address Plaintiff's physical impairments. *See* Doc. 13. As such, the undersigned summarizes only records related to Plaintiff's physical impairments. *See Kennedy v. Comm'r of Soc. Sec.*, 87 F. App'x 464, 466 (6th Cir. 2003) (arguments not raised in opening brief deemed waived).

middle back and spine pain. (Tr. 440). Dr. Pluskota noted vertebral spine tenderness in the upper thoracic spine, paraspinal muscle spasm bilaterally, moderately restricted and painful range of motion in the upper back, antalgic side bend posture, mild vertebral spine tenderness, paraspinal spasm on the left side, negative bilateral straight leg raise testing, normal motor system, normal sensory exam, bilaterally symmetrical reflexes, antalgic gait and posture, and decreased and painful lower back range of motion. (Tr. 441). Dr. Pluskota assessed backache and prescribed Flexeril, a diclofenac enteric coated sodium tablet, and Ultram. *Id*. X-rays of Plaintiff's thoracic and lumbar spine taken the same day revealed mild degenerative change in the thoracic spine, no acute abnormality, limited degenerative change of the lower lumbar spine, possible pars defects of L4, and a healing fracture of the right eleventh rib. (Tr. 408).

Later in November, Plaintiff reported to the emergency room for mental health treatment. (Tr. 480). Plaintiff complained of chronic neck and back pain but physical examination was unremarkable. (Tr. 480-81).

Consultative examiner Lisa Schroeder, M.D., examined Plaintiff one year later, in late November 2011. (Tr. 449). Plaintiff's chief complaint was low back and neck pain. *Id*. Dr. Schroeder said Plaintiff had ulnar nerve damage and surgery due to repeated use of a sledgehammer. *Id*. Plaintiff told Dr. Schroeder his daily functions were limited, he elevated his feet as much as possible, but was able to do some dishes and drive. *Id*. Plaintiff underwent treatment with a chiropractor and noted Tramadol did not seem to help but home stretching helped a little. *Id*. At the time, Plaintiff lived in a home with twenty steps, and had pain going up and down. (Tr. 449-50). He did not use a cane or a walker. *Id*. On examination, Plaintiff had good range of motion in his neck, slightly decreased range of motion in his shoulders, slightly decreased strength in the upper and lower extremities, normal gait, and difficulty with heel-to-toe walking.

*Id*. Dr. Schroder assessed Plaintiff with degenerative disc disease in the back and neck with some radiculopathy causing anterior leg pain and bilateral arm pain with numbness and tingling. *Id*.

At a January 2012 emergency room visit for mental health treatment and chronic back pain, an examination of Plaintiff's back and neck was normal and he had normal reflexes. (Tr. 474-75).

Plaintiff treated with Keaton Bullen, M.D., of the Internal Medicine Center, in February 2012, where examination revealed intact sensation except in the bilateral distal fingers, decreased patellar reflexes bilaterally, and full motor strength in the upper and lower extremities. (Tr. 504-05). Plaintiff was diagnosed with low back pain and prescribed cyclobenzaprine and Naprosyn. (Tr. 506). An x-ray revealed degenerative changes in the lower lumbar spine, no subluxation with flexion or extension, and no acute findings. (Tr. 492).

Later in February 2012, a provider at the Internal Medicine Center found Plaintiff had a mildly tender lumbar and sacral spine, nontender paraspinal musculature, negative straight leg raise testing, and no clubbing or edema in the extremities. (Tr. 501-02). The provider diagnosed low back pain and prescribed Naprosyn. (Tr. 502).

For two days in April 2012, Plaintiff treated at Beebe Medical Center for complications related to gastrointestinal bleeding. (Tr. 521-44). During his stay, the attending physicians indicated Plaintiff denied back and neck pain and had normal physical examinations. (Tr. 530-31).

Twice in May 2012, Hector Maya, M.D., treated Plaintiff for joint pain associated with back pain and gait disturbance. (Tr. 549, 553). On examination, Plaintiff had joint pain, gait disturbance, joint swelling, and bilateral mild low back pain, but no neck pain, muscle pain or weakness. (Tr. 549, 553). Dr. Maya diagnosed lower back pain and advised Plaintiff to continue his medication regimen. (Tr. 550, 555). Dr. Maya ordered x-rays of Plaintiff's lumbosacral spine, which revealed degenerative disc disease at L4-L5 and L5-S1 with possible unilateral

spondylolysis of L4 on the right side, minimal spondylolisthesis of L4 on L5, and facet arthritis at L4-L5 and L5-S1. (Tr. 547).

Later in May 2012, Plaintiff treated with John Greco, M.D., for longstanding back pain. (Tr. 565). Plaintiff reported a history of performing heavy work in a foundry. *Id*. On examination, Plaintiff was not in acute distress; ambulated with a normal heel-to-toe gait; had no difficulty with stance or station; showed no obvious structural abnormality in the thoracolumbar spine; had a mild restriction in range of motion in flexion, extension, and lateral bending; no instability with flexion or extension; mild diffuse tenderness; moderate restriction in range of motion in the lumbar spine; normal muscle strength and tone; and negative straight leg raise testing in the seating and supine positions. (Tr. 565-66). Dr. Greco diagnosed degenerative disc disease, degenerative spondylolisthesis, lumbar radiculopathy, possible concomitant cervical degenerative disc disease or cervical radiculopathy and recommended conservative treatment. (Tr. 566-67).

An MRI of the lumbar spine conducted in June 2012 revealed one-to-two millimeters of anterolisthesis L4 on L5 without spondylolysis or stenosis; osteophyte formation and bulging one-to-two millimeters at the L4-5 and L5-S1 levels with mild bilateral foraminal narrowing; and no central canal stenosis, nerve root swelling, or displacement. (Tr. 557-58).

Plaintiff followed-up with Eric W. Eaton, P.A. (in Dr. Greco's office), in June 2012. (Tr. 560). Plaintiff's examination was generally unchanged. (Tr. 560-61). Mr. Eaton reviewed Plaintiff's MRI and diagnosed low back pain, adding the neurologic exam was benign and there was no evidence of any surgical indications. (Tr. 561).

Consultative examiner Britney Carter, D.O., examined Plaintiff in October 2012, where Plaintiff had no tenderness to palpation spinally or paraspinally from the occiput to the sacral base, negative straight leg raise testing, some limitations in motion of the dorsolumbar spine, ability to

get off and on the examination table without difficulty, inability to bend over and touch toes, 5/5 strength testing bilaterally in the upper extremities, and 4/5 strength testing bilaterally in the lower extremities – however, Dr. Carter noted Plaintiff did not give his best effort. (Tr. 573-75). Plaintiff was unable to perform heel-to-toe walking and appeared unsteady on his feet. (Tr. 575).

In March 2013, Plaintiff treated with Dr. Bullen while awaiting an orthopedic appointment. (Tr. 581-83). Plaintiff had normal motor strength, midline bony prominence near L3-L4, mild bilateral paraspinal muscle spasm, normal bilateral upper and lower extremities, diminished patellar reflex bilaterally, and 2/4 Achilles reflexes. (Tr. 582). Dr. Bullen prescribed Tramadol. (Tr. 583).

Later in March 2013, Plaintiff saw orthopedic specialist Susan M. Moen, M.D. (Tr. 590). Although Dr. Moen's examination of Plaintiff was unremarkable, she diagnosed cervical and lumbar radiculopathy. *Id*. Dr. Moen recommended Plaintiff try non-operative modalities such as steroid injections and physical therapy. *Id*.

Plaintiff saw Dr. Bullen again in May 2013. (Tr. 584). Plaintiff said he had not returned to see the orthopedic doctor since they "messed up" his corticosteroid injection by ordering a cervical, rather than lumbar injection. *Id*. On examination, Plaintiff had midline bony prominence near L3-4, mild bilateral paraspinal muscle spasm, paraspinal spasm, normal bilateral upper and lower extremities, diminished patellar reflex bilaterally, no vertebral spine tenderness, a range of motion in the neck with limited lateral bending and rotations, normal neck flexion and extension, normal neck motor strength, and diminished bilateral neck sensation distally. (Tr. 585). Plaintiff requested stronger medication even though he reported Tramadol helped somewhat. *Id*. Dr. Bullen noted Plaintiff was unable to afford steroid injections and had been denied coverage at two pain management centers. *Id*.

Plaintiff underwent a cervical spine MRI in May 2013. (Tr. 588). The imaging revealed moderate degenerative changes of the mid and lower cervical spine, canal stenosis at C4-C5 and C5-C6, and a prominent disc herniation left of the midline flattening the left side of the spinal cord at C5-C6. (Tr. 589).

In September 2016, Plaintiff treated with internal medicine specialist William Muse, D.O. (Tr. 1122-29). Plaintiff complained of neck and back pain, migraines, and numbness in his arms and legs. (Tr. 1122). On examination, Plaintiff had a limited range of motion in his cervical and lumbar spine, but a normal gait. (Tr. 1124). Dr. Muse diagnosed chronic bilateral low back pain with right-sided sciatica. *Id*.

A November 2016 x-ray of Plaintiff's lumbar spine showed multilevel degenerative changes, including disc space narrowing at L4-L5 and L5-S1. (Tr. 1069). A concurrent x-ray of the cervical spine showed degenerative disc disease, including disc space narrowing and spondylosis at C4-C5, C5-C6, and C7. (Tr. 1070).

Plaintiff underwent a consultative examination in December 2016 with Joshua Natali, D.O. (Tr. 1090-1107). Plaintiff reported neck pain and back pain which radiated to his legs, arm numbness, upper extremity weakness, dizziness, and migraines. (Tr. 1090). His pain was 7/10 on most days and was a 6-7/10 during the examination. *Id*. On examination, Plaintiff had a symmetric, steady gait and did not use an assistive device. (Tr. 1092). Plaintiff did not have any joint swelling, erythema, effusion, tenderness, or deformity. (Tr. 1093). He could lift, carry, and handle light objects and squat and rise from that position "with ease". *Id*. Plaintiff could rise from a seated position without assistance and had no difficulty getting up and down from the exam table. *Id*. He was able to walk on heels and toes "with ease" and had a normal tandem walk. *Id*. Plaintiff could hop on either foot. *Id*. Dr. Natali noted Plaintiff was cooperative and gave good effort during the

examination. *Id*. Lumbar x-rays performed in conjunction with the consultative examination revealed slight anterolisthesis and loss of disc height noted at L4-L5 and L5-S1, and multilevel arthrosis. (Tr. 1084). Cervical x-rays revealed loss of disc height and spurring at C4-C5, C5-C6, and C6-C7 with facet and uncovertebral spurring throughout the cervical spine. (Tr. 1085). There was right foraminal narrowing at C6-C7, and left foraminal narrowing at C5-C6 and C6-C7. *Id*.

A January 2017 MRI of the cervical spine revealed multilevel degeneration, with disc bulging, mild to severe foraminal narrowing, facet and uncovertebral hypertrophy, and osteophyte complex impressing the ventral thecal sac. (Tr. 1113).

Plaintiff saw Robert Crawford, M.D., in January 2017. (Tr. 1119). Dr. Crawford noted that a nerve conduction study revealed bilateral carpal tunnel syndrome. (Tr. 1117). On examination, Plaintiff had cervical tenderness; abnormal extension, flexion, and lateral bends bilaterally; positive straight leg raises bilaterally; normal sensation; decreased upper extremity strength; and normal reflexes. (Tr. 1119). Dr. Crawford diagnosed spinal stenosis of the cervical spine and bilateral carpal tunnel syndrome. *Id*. He recommended physical therapy and referred Plaintiff to a hand surgeon for carpal tunnel treatment. *Id*.

Opinion Evidence

*Treating Physician*

In February 2012, Dr. Bullen opined Plaintiff had decreased bilateral patellar reflexes, full motor strength bilaterally in upper and lower extremities, intact sensation, affected ambulation, and limited range of motion in the lower extremities due to pain. (Tr. 514). Dr. Bullen said Plaintiff would be able to sit without difficulty; appeared to be in moderate pain while lying on his back and with certain movement of the low back; became tearful during the exam; had a slow, affected,

10

limited ambulation; and limited bending ability. (Tr. 515).

*Examining Physicians*

 In November 2011, Dr. Schroeder opined Plaintiff would not be able to do any heavy lifting or carrying, but could frequently lift up to ten to twenty pounds at a time. (Tr. 450). Plaintiff could not work with small objects and would be able to work in a "moving active" position 30 to 60 minutes at a time for up to four to six hours per day. (Tr. 450-51). Plaintiff could work in a standing position for 30 to 60 minutes at a time for up to four to six hours per day and would be able to work in a seated position for one to two hours at a time for up to eight hours per day. (Tr. 451).

In October 2012, Dr. Carter concluded Plaintiff could complete a full work shift as long as he did not have to sit for longer than 30 minutes, stand for more than ten minutes, or walk farther than 25 feet without taking a break. (Tr. 575).

In December 2016, Dr. Natali opined Plaintiff "could sit, stand, and walk normally in an eight-hour workday with normal breaks" and did not need an assistive device (Tr. 1094). Plaintiff did not have any significant limitations with lifting and/or carrying weight. *Id*. Dr. Natali also found Plaintiff had no limitations on bending, stooping, crouching, or squatting, and could perform these tasks "frequently". *Id*. Further, Dr. Natali found Plaintiff did not have any manipulative restrictions (reaching, handling, feeling, grasping, or fingering) and could perform these tasks "frequently". *Id*.

*State Agency Physicians*

In December 2011, State agency physician Gerald Klyop, M.D., reviewed Plaintiff's records and assessed Plaintiff's residual functional capacity ("RFC"). (Tr. 109). Dr. Klyop determined in an eight-hour workday, Plaintiff could lift or carry up to twenty pounds occasionally

11

and ten pounds frequently, stand or walk for about six hours, sit for more than six hours, and had

a limited ability to push or pull in his right upper extremities. *Id*. Plaintiff was unlimited in his

ability to reach and feel, but limited to frequent bilateral handling and fingering. (Tr. 110). Plaintiff

could occasionally push or pull with his right arm. (Tr. 109).

In November 2012, on reconsideration, State agency physician Jeffrey Vasiloff, M.D.,

concurred with the above findings, except that he found Plaintiff was unlimited in his ability to

reach, handle, and feel, but limited to frequent fingering bilaterally. (Tr. 160). Dr. Vasiloff further

noted Plaintiff could occasionally climb ramps and stairs, stoop, kneel, crouch, and crawl. *Id*. He

could frequently balance, but never climb ladders. *Id*.

## VE Testimony

A VE appeared and testified at the November 2016 hearing before the ALJ. *See* Tr. 724-

62. The ALJ asked the VE to consider a person with Plaintiff's age, education, and vocational

background who:

> can lift, carry, push and pull 20 pounds occasionally and 10 pounds frequently; this
> person can sit for six hours; stand and/or walk for six hours in a normal workday;
> this person cannot climb ladders, ropes, or scaffolds; and can occasionally climb
> ramps and stairs; this person can occasionally stoop, kneel, crouch and crawl; this
> person can frequently handle and finger bilaterally; this person cannot reach
> overhead bilaterally; this individual is further limited to simple, routine tasks that
> do not involve arbitration, negotiation or confrontation; this person cannot direct
> the work of others or be responsible for the safety or welfare of others; this person
> cannot perform piece rate work and cannot perform assembly line work; this person
> is limited to occasional interaction with others.

(Tr. 725-26). The VE opined such an individual could not perform Plaintiff's past work but could

perform other jobs such as a hand packer, router, or a marker. (Tr. 726-27).

## ALJ Decision

In a written decision dated April 28, 2017, the ALJ found Plaintiff met the insured status

requirements for DIB through March 31, 2016 and had not engaged in substantial gainful activity

12

since his amended alleged onset date (July 28, 2010). (Tr. 624). He concluded Plaintiff had severe impairments of: degenerative disc disease of the cervical and lumbar spine, diverticulosis, carpal tunnel syndrome, depression and alcohol dependence in remission. *Id*. However, the ALJ found none of these impairments (alone or in combination) met or medically equaled the severity of a listed impairment. (Tr. 625). Next, the ALJ set forth Plaintiff's RFC:

> [T]he claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) except that the claimant may occasionally stoop, kneel, crouch, crawl, climb ramps and stairs, but may never climb ladders, ropes or scaffolds; the claimant may never reach overhead with the bilateral upper extremities; the claimant may frequently handle and finger with the bilateral upper extremities; the claimant must avoid all exposure to workplace hazards, including unprotected heights and dangerous moving machinery; the claimant is limited to the performance of simple, routine tasks that do not involve arbitration, negotiation, confrontation, direction of, or conferral of responsibility upon the claimant for the safety or welfare of others, undertaken in a work setting free of "piece rate" work or assembly line work, which setting involves only occasional interaction with others.

(Tr. 627-28). The ALJ found Plaintiff was unable to perform past relevant work; was defined as a "younger individual" on the alleged onset date; and had a high school education (Tr. 635). The ALJ concluded that, considering Plaintiff's age, education, work experience, and RFC, Plaintiff could perform jobs that existed in significant numbers in the national economy. *Id*. Thus, the ALJ found Plaintiff not disabled from July 28, 2010 (the alleged onset date), through the date of his decision. (Tr. 636).

## STANDARD OF REVIEW

In reviewing the denial of Social Security benefits, the Court "must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record." *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 528 (6th Cir. 1997). "Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as

a reasonable mind might accept as adequate to support a conclusion." *Besaw v. Sec'y of Health & Human Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992). The Commissioner's findings "as to any fact if supported by substantial evidence shall be conclusive." *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006) (citing 42 U.S.C. § 405(g)). Even if substantial evidence or indeed a preponderance of the evidence supports a claimant's position, the court cannot overturn "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003).

### STANDARD FOR DISABILITY

Eligibility for benefits is predicated on the existence of a disability. 42 U.S.C. §§ 423(a), 1382(a). "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. §§ 404.1505(a) & 416.905(a); *see also* 42 U.S.C. § 1382c(a)(3)(A). The Commissioner follows a five-step evaluation process—found at 20 C.F.R. §§ 404.1520 and 416.920—to determine if a claimant is disabled:

1. Was claimant engaged in a substantial gainful activity?

2. Did claimant have a medically determinable impairment, or a combination of impairments, that is "severe," which is defined as one which substantially limits an individual's ability to perform basic work activities?

3. Does the severe impairment meet one of the listed impairments?

4. What is claimant's residual functional capacity and can claimant perform past relevant work?

5. Can claimant do any other work considering his residual functional capacity, age, education, and work experience?

Under this five-step sequential analysis, the claimant has the burden of proof in Steps One through Four. *Walters,* 127 F.3d at 529. The burden shifts to the Commissioner at Step Five to establish whether the claimant has the residual functional capacity to perform available work in the national economy. *Id.* The ALJ considers the claimant's residual functional capacity, age, education, and past work experience to determine if the claimant could perform other work. *Id.* Only if a claimant satisfies each element of the analysis, including inability to do other work, and meets the duration requirements, is he determined to be disabled. 20 C.F.R. §§ 404.1520(b)-(f) & 416.920(b)-(f); *see also Walters*, 127 F.3d at 529.

**DISCUSSION**

Plaintiff raises two challenges to the ALJ's determination. First, that the ALJ failed to follow the remand order to consider whether Plaintiff met, or equaled, Listing 1.04. (Doc. 13, at 17-22). And second, that the ALJ erred in finding Plaintiff could use his hands on a frequent basis. *Id*. at 22-24. The Commissioner responds that the ALJ's decision on both issues is supported by substantial evidence. (Doc. 17, at 9-17). For the reasons discussed below, the undersigned finds the Commissioner's decision supported by substantial evidence and recommends it be affirmed.

<u>Listing 1.04</u>

First, Plaintiff argues the ALJ failed to evaluate whether Plaintiff met, or equaled, Listing 1.04 as required by the remand order. (Doc. 13, at 17-22). The Commissioner responds that the ALJ gave a thorough analysis of Listing 1.04, and his findings are supported by substantial evidence. (Doc. 17, at 9-17). For the reasons stated below, the undersigned agrees with the Commissioner, and finds the ALJ's findings supported by substantial evidence in this regard.

Plaintiff bears the burden at Step Three of establishing that her impairments meet or medically equal a listing. *See Buress v. Sec'y of Health & Human Servs.*, 835 F.2d 139, 140 (6th

15

Cir. 1987); *Bingaman v. Comm'r of Soc. Sec.*, 186 F. App'x 642, 645 (6th Cir. 2006). The Listing of Impairments, located at Appendix 1 to Subpart P of the regulations, describes impairments the Social Security Administration considers "severe enough to prevent an individual from doing any gainful activity, regardless of his or her age, education, or work experience." 20 C.F.R. §§ 404.1525(a), 416.925(a). In other words, a claimant who meets or medically equals the requirements of a listed impairment will be deemed conclusively disabled. *See Reynolds v. Comm'r of Soc. Sec.*, 424 F. App'x 411, 414 (6th Cir. 2011). "A claimant must satisfy all of the criteria to meet the listing," *Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647, 653 (6th Cir. 2009), and must meet all the criteria concurrently for a period of at least twelve continuous months, *see* 20 C.F.R. §§ 404.1525(c)(3)-(4), 404.1509, 416.925(c)(3)-(4), 20 C.F.R. pt. 404, subpt. P, Listing 1.00(D) ("Because abnormal physical findings may be intermittent, their presence over a period of time must be established by a record of ongoing management and evaluation."); *Sullivan v. Zebley*, 493 U.S. 521, 530 (1990) ("For a claimant to show that his impairment matches a listing, it must meet *all* of the specified medical criteria. An impairment that manifests only some of those criteria, no matter how severely, does not qualify.") (emphasis in original); *Blanton v. Soc. Sec. Admin.*, 118 F. App'x 3, 6 (6th Cir. 2004) ("When all the requirements for a listed impairment are not present, the Commissioner properly determines that the claimant does not meet the listing.").

Under the regulations, to meet Listing 1.04, a plaintiff must show:

**1.04 Disorders of the spine** (e.g., herniated nucleus pulposus, spinal arachnoiditis, spinal stenosis, osteoarthritis, degenerative disc disease, facet arthritis, vertebral fracture), resulting in compromise of a nerve root (including the cauda equina) or the spinal cord. With:

A. Evidence of nerve root compression characterized by neuro-anatomic distribution of pain, limitation of motion of the spine, motor loss (atrophy with associated muscle weakness or muscle weakness) accompanied by sensory or reflex loss and, if there is involvement of the lower back, positive straight-leg raising test (sitting and supine); or

16

B. Spinal arachnoiditis, confirmed by an operative note or pathology report of tissue biopsy, or by appropriate medically acceptable imaging, manifested by severe burning or painful dysesthesia, resulting in the need for changes in position or posture more than once every 2 hours; or

C. Lumbar spinal stenosis resulting in pseudoclaudication, established by findings on appropriate medically acceptable imaging, manifested by chronic nonradicular pain and weakness, and resulting in inability to ambulate effectively, as defined in 1.00B2b.

20 C.F.R. pt. 404, subpt. P, Listing 1.04. Thus, to meet Listing 1.04, Plaintiff must show he satisfies the criteria in the introductory paragraph *and* one of the criteria set forth in (A), (B), or (C). Here, Plaintiff argues he meets the criteria set forth in subsections (A) and (C).

As to Listing 1.04, the ALJ set forth a detailed explanation of his conclusion that Plaintiff did not meet or medically equal the listing:

Relevant to Listing 1.04, radiographic and imaging studies of the lumbar spine (2F/21), (12F/3), (16F/3), (18F/2), (29F/2), and (32F/2) have given no indication of ankylosis, or compression of the spinal cord or nerve roots at any vertebral level. In addition, clinical studies across the record (1F/6, (7F/3), (30F/4), (33F/4), have reported a normal and unassisted gait, such that the record does not indicate the claimant is unable to ambulate effectively. I did give careful consideration to the imaging study of the cervical spine, date May 15. 2013, which did indicate[] flattening of the spinal cord at the C5-C6 vertebral level (22F/3). However, I also note subsequent imagining of the cervical spine, dated January 17, 2017, which indicated ongoing multi-level degenerative disease, but no definitive compressive pathology at any level (32F/3). This appears corroborated by the electrodiagnostic studies dated January 18, 2017, which indicated no evidence of a cervical radiculopathy (36F/3). Otherwise, radiographic and scanning studies of the cervical spine (1F/22), (29F/3), have given no indication of ankylosis. Clinical studies have shown some deficits of fine coordination (7F/6), however, this appears transient, when examining later examinations (10F/10), (20F/5), (33F/7), and throughout the record, the claimant's grasp, manipulation and pinch abilities have been reported as normal (7F/6), (10F/10), (20F/5), (33F/7). The record does not, on the whole, support the contention that he is unable to engage in find and gross manipulation effectively.

(Tr. 625-26). The undersigned finds the ALJ's thorough analysis here supported by substantial evidence.

*Medical Equivalence*

First, contrary to Plaintiff's assertion that the ALJ did not address medical equivalence (Doc. 13, at 19), the ALJ explicitly stated Plaintiff did not "meet[] *or medically equal*[] the severity of one of the listed impairments." (Tr. 625) (emphasis added). In support of this finding, the ALJ added:

> [n]o treating or examining physician has indicated findings that would satisfy the severity requirements of any listed impairment. In reaching the conclusion that the claimant does not have an impairment or combination of impairments that meet or medically equal a listed impairment, I also considered the opinion of the State Agency medical consultants who evaluated this issue at the initial and reconsideration levels of the administrative review process and reached the same conclusion. All of the listings were considered in reaching this finding, with specific emphasis on listings 1.04, 5.06, 11.14, and 12.04.

(Tr. 625) (internal citations omitted). Under the regulations, medical equivalency must be based on the medical evidence of record and "the opinion given by one or more medical or psychological consultants designated by the Commissioner." 20 C.F.R. §§ 404.1526(c), 416.926(c). Here, the ALJ expressly considered the opinions of the consulting physicians and, as discussed in detail below, properly considered their opinions and the medical evidence of record. The ALJ's decision regarding medical equivalence is supported by substantial evidence.

*Subsection (A)*

To show he satisfies the criteria of subsection (A), Plaintiff must demonstrate nerve root compression, resulting in four distinct symptoms: (1) neuro-anatomic distribution of pain, (2) limitation of motion of the spine, (3) motor loss accompanied by sensory or reflex loss, *and* (4) positive straight-leg raising test (if there is involvement of the lower back). 20 C.F.R. pt. 404, subpt. P, Listing 1.04.

Here, as evidence of nerve root compression, Plaintiff points to an isolated MRI finding from May 2013, which showed a disc herniation, left of the midline, flattening the left side of the

spinal cord at C5-C6. (Doc. 13, at 19) (citing Tr. 588-89). However, as the ALJ pointed out, this MRI, and Plaintiff's other imaging studies, "have given no indication of ankylosis, or compression of the spinal cord or nerve roots at any vertebral level." (Tr. 625) (citing Tr. 408 (November 2010 lumbar and thoracic x-rays); Tr. 492 (February 2012 cervical spine x-ray); Tr. 547 (May 2012 x-ray); Tr. 557 (June 2012 spine MRI); Tr. 1069 (November 2016 spine x-ray); Tr. 1084 (December 2016 spine)).

Even if Plaintiff established nerve root compression, to satisfy the criteria of subsection (A), this alone is not sufficient. Plaintiff must show nerve root compression characterized by *all* of the above-listed symptoms. 20 C.F.R. pt. 404, subpt. P, Listing 1.04. In support, Plaintiff points to some isolated findings of muscle weakness with sensory and reflex loss (Doc. 13, at 19) (citing Tr. 505, 1119), neuro-anatomic distribution of pain, *id*. (citing Tr. 450, 1119), and limitation of motion of the spine, *id*. (citing Tr. 453[2], 575, 1119). However, as the ALJ pointed out:

> [c]linical studies have shown some deficits of fine coordination, however, this appears transient, when examining later examinations, and throughout the record, the claimant's grasp, manipulation and pinch abilities have been reported as normal. The record does not, on the whole, support the contention that he is unable to engage in fine and gross manipulation effectively.

(Tr. 625-26) (internal citations omitted). Thus, the ALJ clearly recognized Plaintiff had some difficulties with fine coordination, but he also cited several pieces of conflicting evidence in the record, which indicated Plaintiff's condition "appear[ed] transient". *Id*. Substantial evidence supports this conclusion. For example, the ALJ points to several later-conducted examinations where Plaintiff's fine coordination was normal. (Tr. 625) (citing Tr. 478 (January 2012 emergency

---

2. The undersigned notes that the manual muscle testing results on this page reflect findings of "good" or "normal" in all categories except fine coordination of the fingers bilaterally. *See* Tr. 453.

room examination revealing "no gross weakness" and intact motor and sensory abilities); Tr. 576-77 (October 2012 manual muscle testing revealing relatively normal findings of "good" or "normal" in all categories including fine coordination of the fingers bilaterally); Tr. 1095-98 (December 2016 manual muscle testing revealing "normal" findings in every single category including fine coordination of the fingers bilaterally)). Further, the ALJ noted that Plaintiff's grasp, manipulation, and pinch abilities have been reported as normal "throughout the record". (Tr. 625-26) (citing Tr. 453 (November 2011 manual muscle testing showing "normal" grasp, manipulation, and pinch abilities); Tr. 478 (January 2012 examination revealing normal findings); Tr. 576 (October 2012 manual muscle testing revealing "normal" grasp, manipulation, pinch, and fine coordination); Tr. 1095 (December 2016 manual muscle testing revealing same)).

Importantly, the "duration requirement" within the regulations provides that Plaintiff has the burden of showing that he has a severe impairment and the impairment has lasted (or is expected to last) for a continuous period of at least twelve months. *See* 20 C.F.R. §§ 404.1509, 404.1521, 416.909, 416.921. Here, as the ALJ correctly noted, Plaintiff's symptoms have not been consistent, but rather, "transient", thereby failing to meet the twelve-month requirement. (Tr. 625). For the reasons discussed above, the undersigned finds the ALJ's conclusion regarding Listing 1.04(A) supported by substantial evidence.

Finally, as to the criteria in subsection (C), the ALJ concluded Plaintiff had not demonstrated pseudoclaudication resulting in the inability to ambulate effectively. (Tr 625). In support, the ALJ accurately cited records where providers "reported a normal and unassisted gait, such that the record does not indicate the claimant is unable to ambulate effectively." *Id*. (citing Tr. 352 (August 2010 hospital visit where Plaintiff demonstrated a normal gait); Tr. 450 (2011 consultative examination showing same); Tr. 1074 (November 2016 consultative examination

showing same); Tr. 1092 (December 2016 consultative examination showing normal gait and that Plaintiff did not use an assistive device)). The undersigned therefore finds the ALJ's conclusion regarding subsection (C) supported by substantial evidence.

In sum, the ALJ provided a thorough analysis of his conclusion that Plaintiff did not meet (or medically equal) Listing 1.04. (Tr. 625-26). And, although Plaintiff can point to evidence suggesting a contrary conclusion, this Court must affirm even if substantial evidence or indeed a preponderance of the evidence supports a claimant's position, "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones,* 336 F.3d at 477. For the foregoing reasons, the undersigned finds the ALJ's listing analysis supported by substantial evidence and recommends the decision be affirmed in this regard.

*Consultative Examiner's Opinions*[3]

Within Plaintiff's Listing argument, he contends the ALJ erred in his evaluation of the opinions of consultative examiners Drs. Carter and Schroeder. (Doc. 13, at 19). The Commissioner responds that the ALJ properly evaluated these opinions. (Doc. 17, at 14).

As an initial matter, an examining, but not treating, source is one who has examined Plaintiff, but did not have an ongoing treatment relationship. 20 C.F.R. §§ 404.1527, 404.1502,

---

3. In his brief, Plaintiff alleges the ALJ "disregarded the opinions and findings of the treating and examining physicians in this matter." (Doc. 13, at 20). Plaintiff's arguments regarding the examining physicians are fully developed, however, as the Commissioner correctly points out, his arguments surrounding the treating physicians are not. (Doc. 17, at 14). Plaintiff devotes almost two pages of his brief to the regulations and case law about treating physicians but offers no application of the law to the record. *See* Doc. 13, at 20-21. Plaintiff does not identify the treating physician opinion to which he refers, nor does he identify what was problematic about the ALJ's treatment of that opinion Because Petitioner's treating physician argument is skeletal (at best), the undersigned finds it waived. *See McPherson v. Kelsey*, 125 F.3d 989, 995-96 (6th Cir. 1997) ("It is not sufficient for a party to mention a possible argument in the most skeletal way, leaving the court to put flesh on its bones."); *Kennedy*, 87 F. App'x at 466 ("[Issues] averted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived.") (internal quotation and citation omitted).

416.927, 416.902; SSR 96-2, 1996 WL 374188, at *1. The ALJ is required to weigh the opinion of agency examining physicians under the same factors as treating physicians, including the supportability and consistency of those opinions. *See* 20 C.F.R. §§ 404.1527(d), 416.927(d). However, the *explanatory* requirement "does not apply to opinions from physicians who . . . have examined but not treated a claimant, the ALJ's decision still must say enough to allow the appellate court to trace the path of his reasoning." *Stacey v. Comm'r of Soc. Sec.*, 451 F. App'x 517, 519 (6th Cir. 2011). Thus, the question is not one of "good reasons", but rather whether the ALJ's reasoning in this regard is supported by substantial evidence. *Walters*, 127 F.3d at 528. As discussed below, the undersigned concludes that it is.

Here, Dr. Schroeder examined Plaintiff once in November 2011, at the request of the Bureau of Disability Determination. (Tr. 449-51). The ALJ accorded partial weight to Dr. Schroeder's opinion. (Tr. 633). This was, in part, because he found unsupported Dr. Schroeder's conclusion that Plaintiff was unable to work with small objects. *Id*. (citing Tr. 450). The ALJ explained Dr. Schroeder's finding in this regard may have been consistent with her own observations, but it was inconsistent with the record, citing many of the same examination findings identified above under the Listing analysis. *Id.* (citing Tr. 478, 576, 1095). Further, the ALJ accorded partial weight to Dr. Schroeder's opinion regarding standing and walking because "[t]he overall record, while supportive of restriction to light work, does not support an inability to stand and/or walk in increments of less than two hours." *Id.* The ALJ's conclusion in this regard is supported by his earlier analysis of the evidence which showed Plaintiff's consistently normal gait

---

Plaintiff attempts to more fully develop a treating physician argument in Reply. (Doc. 19, at 4). However, it comes too late, as it is well established that new substantive issues cannot be raised in a reply brief. *See United States v. Crozier*, 259 F.3d 503, 517 (6th. Cir. 2001) (citing *United States v. Jerkins*, 871 F.2d 598, 602 (6th Cir. 1989)).

and ability to ambulate without an assistive device. *See* Tr. 625 (citing Tr. 352 (August 2010 hospital visit where Plaintiff demonstrated a normal gait); Tr. 450 (2011 consultative examination finding same); Tr. 1074 (November 2016 consultative examination finding same); Tr. 1092 (December 2016 consultative examination finding normal gait and that Plaintiff did not use an assistive device)). Finally, the ALJ explained, "[o]n balance, this opinion is partially supported by, and partially consistent with the overall evidence of record[.]" (Tr. 633). As described above, the ALJ addressed several record inconsistencies and further found the opinion only partially supported. *Id.* The ALJ was well within the regulatory boundaries when he decided to assign Dr. Schroeder's opinion partial weight based upon these factors, and the undersigned finds that decision supported by substantial evidence. *See* 20 C.F.R. §§ 404.1527, 416.927.

The ALJ afforded Dr. Carter's opinion "little" weight because her opinion was primarily based on Plaintiff's subjective complaints, and her opinion was "not consistent with, or supported by, the whole of the evidence of record[.]" (Tr. 633). These reasons are supported by the record. First, the ALJ found Dr. Carter's opinion was based primarily upon Plaintiff's subjective symptoms, "which suggests that Dr. Carter permitted substitution of the claimant's judgment for her own," (Tr. 633), and this is not error. *See Glasgow v. Comm'r of Soc. Sec.*, 690 F. App'x 385, 387 (6th Cir. 2017) (holding that an ALJ may properly disregard an examining psychologist's opinion when that opinion in based in large part on a plaintiff's subjective complaints). And, as he did with Dr. Schroeder, the ALJ found Dr. Carter's opinion not consistent with, or supported by, the record as a whole. (Tr. 633). This statement, although brief, touched two factors an ALJ is required to consider in 20 C.F.R. §§ 404.1527, 416.927 – supportability, and consistency—which is all that is required. *Allen v. Comm'r of Soc. Sec.,* 561 F.3d 646, 651 (6th Cir. 2009) (finding a

brief statement for discounting an opinion sufficient because it accounted for several factors in § 404.1527).

For these reasons, the undersigned finds the ALJ's analysis regarding Drs. Schroeder and Carter supported by substantial evidence.

RFC / Step Five Determination

Finally, Plaintiff frames his second argument as a "Step Five" argument. Specifically, Plaintiff argues the ALJ erred in finding he could use his hands on a frequent basis. (Doc. 13, at 22). In Reply, Plaintiff argues the hypothetical question posed to the VE on which the ALJ ultimately relied did not accurately reflect his limitations in this regard. (Doc. 19, at 5). The undersigned finds these challenges are to the underlying limitations within the RFC rather than to the VE testimony itself, as required under Step Five. For the reasons discussed below, the undersigned finds the RFC supported by substantial evidence, and finds no error at Step Five.

*RFC*

A claimant's RFC is an assessment of "the most [she] can still do despite [her] limitations." 20 C.F.R. §§ 404.1545(a)(1), 419.945(a)(1). An ALJ must consider all symptoms and the extent to which those symptoms are consistent with the objective medical evidence 20 C.F.R. §§ 404.1529, 416.929. While an ALJ must consider and weigh medical opinions, the RFC determination is expressly reserved to the Commissioner. *Ford v. Comm'r of Soc. Sec.*, 114 F. App'x 194, 198 (6th Cir. 2004); 20 C.F.R. §§ 404.1527(e)(2), 404.1546, 416.927(e)(2), 416.946. The Court must affirm "so long as substantial evidence also supports the conclusion reached by the ALJ" even if substantial evidence or indeed a preponderance of the evidence *also* supports a claimant's position. *Jones*, 336 F.3d at 477.

24

Plaintiff argues remand is warranted because the RFC did not match Plaintiff's limitations (Doc. 19, at 5), specifically, that he was able to use his hands on a frequent basis (Doc. 13, at 22). As previously discussed, the ALJ *thoroughly* addressed Plaintiff's handling and fingering abilities and cited several points in the record in support. For example, the ALJ pointed to several examinations where Plaintiff's fine coordination was normal. (Tr. 625) (citing Tr. 478 (January 2012 emergency room examination revealing "no gross weakness" and intact motor and sensory abilities); Tr. 576-77 (October 2012 manual muscle testing revealing relatively normal findings of "good" or "normal" in all categories including fine coordination of the fingers bilaterally); Tr. 1095-98 (December 2016 manual muscle testing revealing "normal" findings in every single category including fine coordination of the fingers bilaterally)). Further, the ALJ noted that Plaintiff's grasp, manipulation, and pinch abilities have been reported as normal "throughout the record". (Tr. 625-26) (citing Tr. 453 (November 2011 manual muscle testing showing "normal" grasp, manipulation, and pinch abilities); Tr. 478 (January 2012 examination revealing normal findings); Tr. 576 (October 2012 manual muscle testing revealing "normal" grasp, manipulation, pinch, and fine coordination); Tr. 1095 (December 2016 manual muscle testing revealing same)). These records, cited by the ALJ, provide ample support for his position.

For these reasons, the undersigned finds that the ALJ's limiting Plaintiff to frequent handling and fingering bilaterally in the RFC is supported by substantial evidence.

*Step Five*

To meet the burden at Step Five, the Commissioner must make a finding "'supported by substantial evidence that [Plaintiff] has the vocational qualifications to perform specific jobs.'" *Varley v. Sec'y of Health & Human Servs.*, 820 F.2d 777, 779 (6th Cir. 1987) (quoting *O'Banner v. Sec'y of Health, Educ. & Welfare*, 587 F.2d 321, 323 (6th Cir. 1978)). "Substantial evidence

may be produced through reliance on the testimony of a vocational expert in response to a 'hypothetical' question." *Id*. If an ALJ relies on a VE's testimony in response to a hypothetical to provide substantial evidence, that hypothetical must accurately portray the claimant's limitations. *Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 516-17 (6th Cir. 2010). Importantly, the hypothetical must accurately encompass *the limitations that the ALJ found credible*. *Varley*, 820 F.2d at 779.

Here, the ALJ offered the VE a hypothetical at the November 2016 hearing which thoroughly encompassed the limitations he found credible – light work with: the ability to lift, carry, push and pull twenty pounds occasionally and ten frequently; sit for six hours; stand or walk for six hours; never climb ladders, ropes or scaffolds; occasionally climb ramps and stairs; occasionally stoop, kneel, crouch and crawl; frequently handle and finger bilaterally; cannot reach overhead bilaterally; conduct simple routine tasks that do not involve arbitration, negotiation, or confrontation; cannot direct the work of others or be responsible for their safety; cannot perform piece-rate work; cannot perform assembly line work; and is limited to occasional interaction with others. (Tr. 725-26). In response, the VE provided three jobs available in the national economy which the hypothetical person could perform. (Tr. 726-27). Because the undersigned finds the hypothetical question posed to the VE here matches the limitations the ALJ found credible and ultimately incorporated into the RFC, there is no Step Five error. *Compare* Tr. 628-29 (RFC determination); *with* Tr. 725-26 (hypothetical posed to the VE).

Plaintiff is understandably dissatisfied with the ALJ's analysis of the record and argues the he engaged in improper "cherry picking". (Doc. 13, at 19); (Doc. 19, at 4-5). The problem with a cherry-picking argument is that it runs both ways. Plaintiff argues the ALJ only focused on the positives, whereas his brief emphasizes the negatives. Crediting Plaintiff's argument here would require the Court to re-weigh evidence – which it cannot not do. *DeLong v. Comm'r of Soc. Sec.*

*Admin.*, 748 F.3d 723, 726 (6th Cir. 2014); *see also White v. Comm'r of Soc. Sec.,* 572 F.3d 272, 284 (6th Cir. 2009) ("[W]e see little indication that the ALJ improperly cherry picked evidence; the same process can be described more neutrally as weighing the evidence."). And again, although Plaintiff can point to evidence suggesting a contrary conclusion, this Court must affirm even if substantial evidence or indeed a preponderance of the evidence supports a claimant's position, "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones,* 336 F.3d at 477. For the reasons discussed above, the undersigned finds substantial evidence supports the ALJ's conclusions in this case and recommends the decision be affirmed.

### CONCLUSION AND RECOMMENDATION

Following review of the arguments presented, the record, and the applicable law, the undersigned finds the Commissioner's decision denying SSI and DIB supported by substantial evidence and recommends the decision be affirmed.


 s/James R. Knepp II
United States Magistrate Judge


*ANY OBJECTIONS* to this Report and Recommendation must be filed with the Clerk of Court within fourteen days of service of this notice. Failure to file objections within the specified time WAIVES the right to appeal the Magistrate Judge's recommendation. *See United States v. Walters*, 638 F.2d 947 (6th Cir. 1981); *Thomas v. Arn*, 474 U.S. 140 (1985).